The opinion of the Court was delivered by'
O’Neall, J.
These cases are involved in more difficulty from the mass of testimony brought before the Court than any other circumstance. When divested of all superfluous matter, and properly understood, they present a few plain questions, about which it is perhaps more difficult to reason satisfactorily than it is to decide upon them. The questions may be stated in the following order:
1. When did the legacies in the slaves vest in the legatees?
2. Are any of the ■ legatees bound by the alleged division at the sale of the personal estate, and, if any, who are so bound ?
3. Is the executor Givens bound to'pay interest on the sum which he retained to pay the debt of Beckham and wife ?
4. Is the former recovery of the executors against Mrs. Reynolds, as executrix of a deceased co-exécutor, a bar to the account now.claimed against her by the complainant Givens?
1. The question, when did the legacies vest, depends upon a construction' of the testator’s will. The clause upon which it' must be decided is in the following words: — “It is also my will-and desire that the whole of my negroes be divided equally among the male and female children generally of Martha Givens, the children of Joseph Oswald generally, the children of William Oswald of St. Helena, by name Benjamin and Robert Oswald, together with any child or children which Martha Givens, wife of Charles Givens, might have previous to such division, all share and share alike among such as shall be liv *343 ing at the time of such division, and not otherwise. And that the division shall take place as soon as the debts are paid, and the executors to act as trustees to each child, individually, until they receive their portion at such time as each one shall’come of age, or marriage of the females.” After the attestation clause is the following: — “ Just naming that the children of James Oswald, which I previously unintentionally omitted, should share equally with the other legatees in the distribution of the whole of my negroes.” The general rule in the construction of a will is, that the intention, if not contrary to law, must prevail. That intention, if there is any doubt or uncertainty in a particular clause, is to be collected from the whole will and not from detached parts. But if there is no doubt on the meaning of the testator as to a devise, from the words which he has used, there is no room for either construction or reasoning, to ascertain his intent. It is true the leaning of the Court is in favor of the vesting of legacies; but that leaning cannot be allowed to do away the express words of the testator, unless they should postpone the vesting Jo a period which the law will not permit.
Where a legacy is left to the children of another person, as a class, and no time is fixed when distribution is to be made, the legacy vests at the testator’s death, and none can take under it but such as are then in esse ; but where a future time is fixed for distribution, then all who are in esse at the period of distribution will be entitled to take. These positions were fully considered in the case of Myers vs. Myers, 2 McC. Ch. 214, and that decision constitutes the rule by which all succeeding cases of a similar character must be decided. This rule is, however, said by all the books to be an artificial one, created by the Courts in order to prevent the indefinite postponement of the vesting of a legacy. It is one of convenience.merely, and never was intended to defeat the expressed intention of the testator ; it is a rule of construction, applicable to cases where we might as fairly conclude that the testator intended a present, as a future interest, to pass by his will. It is supposed that the ■ testator intended that the children in esse at his death, should *344 take a vested transmissible interest, and that that is the effect of his will. We might possibly come to this conclusion, if we were at liberty to reject the words “ among such as shall be living at the time of such division, and not otherwise.” But this we cannot do. They are the indicia of the testator’s in-, tention and must have effect. There is nothing in the clause which will apply them exclusively to the children of Mrs. Givens to be born after the testator’s death. They apply to the whole of her children, the children of Joseph and William Oswald mentioned before in the same clause; and they also apply to the children of James Oswald, who were accidentally omitted, but are given the benefit of the provision of this clause by the memorandum at the foot of the will. The effect of that is to insert them in the proper part of that clause; so that it would read “among the male and female children generally of Martha Givens, the children of Joseph Oswald generally, the children of William Oswald of St. Helena, by name Benjamin and Robert, and the children of James Oswald generally.”
It cannot well admit of a doubt, that if the words, “ among such as shall be living at the time of such division, and not otherwise,” have any meaning, they restrict the division of the slaves, among the persons who might be alive, at the time when, according to the will and the operation of law, it ought to have been made. • It may be, that under the clause of the will devising the real estate, the devisees take a vested interest; and, upon looking carefully into that part of the will, that does appear to be the true construction. Yet that cannot alter or destroy the sense of plain and unambiguous words employed in the bequest of the personal estate. The testator had an unquestionable right to dispose of the whole or any part of his estate, to. any persons whom he thought proper to make'the objects of his bounty. Conjecturing as to his intention, I should conclude that it was likely he, intended that the real and personal estate should be divided upon th.e same rule ; but then it would be just as fair to permit the restriction annexed to the bequest of the personalty, to control and fix the construction of *345 the devise of the land, as it would be to permit the clause in relation to the land to give construction to the bequest of the personalty. ’
In cases of doubt as to the testator’s meaning, many means of ascertaining whether a vested or future interest was intended to pass, have been resorted to. If the legatee, between the testator’s death and the time at which he was to have the enjoyment of his legacy, was entitled to the interest, it has been held that this would make it a vested legacy. But that is by no means an infallible criterion, for there are cases where the interest on a legacy purely contingent, has been allowed to the legatee. In this case the testator constitutes his executors trustees for each of the children who were .the objects of his .bounty, and this has been supposed to be equivalent to a devise of the rents and profits to each between his death and the period of the division. This might be so, and not affect the question of construction. But it may admit of a doubt whether he intended that they should act as trustees for each child before a.division was made. Before that time, they were trustees for the whole; and although legally they were, as executors, trustees for all and each, yet the testator seems to have intended, after the division, to create something like a separate trust in favor of each legatee.
The rule of construction, as to whether a legacy shall be considered vested or contingent, seems to be well settled, that where time is .of the substance of the gift, and not a mere direction as to the time of payment, the legacy is contingent; otherwise that it is vested. 2 Salk. 415. This rule applies in all cases where there is a doubt, from general phrases used. But if, in a bequest to two, to be paid at twenty-one years of age, the testator should add, if either die before that time, the one who should survive and attain that age, should have the whole, it could not be pretended that the one who died had a vested and transmissible interest. The testator’s qualification of the bequest, prevents any rule of construction from defeating his intent. Rules of construction are nothing more than the means *346 by which we are enabled to solve a doubtful question of intention. The words of the testator, evincing his intention, is the first rule, to which all others must yield. Looking to the words used by the testator, it is plain that he intended his slaves to be divided among such of the children of Martha Givens, Joseph Oswald, William Oswald and James Oswald, as might he living at the time when, according to the will and the operation of law, a division ought to be made, and that intention, whatever hardship it may work, must have effect.
2. It now becomes important to inquire, when could the executors legally make the division ? and what is the effect of the sale, and the acts of the parties at or after that time 1 ■
The direction of the will is, “ that this division shall take place as soon as the debts are paid.” The testator owed at his death a few known debts, to the'payment of which the cash on hand and other available funds were amply sufficient: these were paid before the sale. But on the day of sale, the executors received notice of a large demand in favor of Beckham and wife, which, after a long litigation, terminated in a decree in their favor for upwards of $10,000.
The words of the will plainly point out the payment of his debts as a condition precedent to a division. But if they receive a literal meaning, the executors had the power, by postponing payment and resorting to the shifts and devices of legal delay, to prevent the vesting of the legacies to any period they might think proper. On the other hand, if the words are restricted to such debts as the executors pleased to acknowledge and to pay, they had it in their power to hasten the period of division and vesting, and thus favor a division to the injury of the legatees. Such uncertainty, arising from an arbitrary discretion, is, if possible, to be avoided. If all the testator’s debts could have been immediately ascertained and paid, and this had been actually done, a division made as soon as the debts were paid, might have been sustained: but when one very large debt was demanded, and remained unpaid, it would be sporting with the testator’s directions to say that a division could be made, *347 because his admitted debts were paid. He had the right to require, if he chose so to do, that his estate should be unincumbered before it went into the possession of his legatees. And such a direction was not, perhaps, without value or wisdom. A division before the payment of his debts might have created a capital for his legatees, of which subsequent events might have deprived them, and in thus defeating a reasonable expectation, might have been the means of producing misery and want, instead of happiness and plenty. It was the duty of the executors, within the' time allowed by law, one year from the testator’s death, to have ascertained the amount of his debts. P. L. 494. And, if possible, it was their duty to have paid them within the same time. At its expiration, the legatees had the right to demand that the division should take place. If it had been sooner demanded, no Court would have ordered a division on being informed that there were outstanding debts. At the end of that time, a sufficient sum for the payment of the debts, if any had remained unpaid, might have been left in the executors’ hands, and the balance distributed. In all events, that was as soon as the legatees had a legal right to demand partition; and if made before, it could only be sustained on a full and clear shewing of the payment of all debts. In this case we are, therefore, driven, necessarily, to say, that a division, before the expiration of one year from the testator’s death, was premature and illegal. Such of the legatees as were then in esse, were alone entitled to a share under this part of his will. But notwithstanding this legal conclusion, I am satisfied that all of the adult legatees are bound by the division, if any was made. For it cannot be denied, that they could, if they chose, make a division which would bind them, although it might be inoperative as to the minors. For, if an infant and adult contract together, the adult is bound, although the infant may not be. Some of the infants were femes covert, and although their interest was a mere possibility, yet as the husbands were sui juris and capable of receiving their shares, any act of theirs which would go to confirm the sale and division may have the same effect against their wives. *348 Their interest was a mere chose in action, which this act of the husband reduced into possession ; and however hardly it may operate upon the females, yet it is one of the necessary incidents of the relation of husband and wife. The wife’s separate legal existence is merged in the coverture, and if she could have been bound by a division made by her consent, when of full age, it follows that she is legally bound by one made by the consent of her husband, notwithstanding her minority. The husband and wife could have demanded partition, and the consent to division is, as to their rights, the same thing as if they had demanded and obtained partition by operation of law.
Having stated these preliminary principles, it is necessary to see what are the facts before any conclusion can be arrived at. The sale, it appears on all hands, was forced on by the other parties against the wishes of Mr. Givens. There appears to be no doubt that the sale was intended to ascertain, in money, the amount to be divided, and that each of the legatees who were capable of so doing might buy, if they chose, the amount of his or her share. At the sale, there were seventeen persons alive who were supposed to be entitled to shares, viz: six children of Mrs. Givens by her husband the defendant, all minors; four children of Joseph Oswald, all infants but two of them, Charlotte Dews and Martha Scanlan, who. were then married; three children of James Oswald, all infants — one of them, Susan Skellon, was married ; the children of Wm. Oswald of St. Helena, William B. and Robert Oswald; and Joseph and John Jenkins, children of Martha Givens by a former marriage, all of whom were of full age. Since the sale and before the period of division, five of the children of Mrs. Givens, and Charlotte Dews, died.
The proof clearly establishes that Wm. B. Oswald, Robert Oswald, Joseph Jenkins, John Jenkins, and the husbands of the females, Dews, Scanlan and Skellon, considered the sale and their purchases in effect a division of the estate into seventeen shares. On the bonds given for their purchases, is endorsed a memorandum — “ This bond is given as security, in case of any *349 demands or suit coming against the estate, or till a final settlement takes place.” This had the effect to make them bonds to refund ; and shews that the parties intended, when the bonds were equal to, or less than one-seventeenth, that each should retain what he had, unless some debt should be established against the estate. Upon the bonds of William B. and Robert Oswald, who each purchased more than one-seventeenth, is endorsed a receipt of the same date with the bonds, and signed by the executors. The receipt on the bond of William B. Oswald is in the following words : — “ Received, 16th April, 1817, from William B. Oswald, Esq., the sum of nineteen hundred and sixty-nine dollars seventy cents, being his proportion of the ne-groes belonging to the estate of George Stephens, sold this day.” That on the bond of Robert is only varied by the use of his name instead of that of William B. This is not only evidence of a division, but is the division itself. An actual division by a sale, and the appropriation of the proceeds to each one having been established, it is binding upon all such as were legally capable of assenting to it. The legatees, William B. Oswald, Robert Oswald, Joseph Jenkins, John Jenkins, Mrs. Skellon and Mrs. Scanlan, are only entitled to one-seventeenth, and must each contribute from their said share one-seventeenth of the debt recovered by Beckham and wife, to the defendant Charles Givens. Any payments or purchases made to or by the husbands of each of these femes covert, were pro tanto legal satisfaction of her share, and must be deducted from it. The same thing would be the case with Mrs.- Dews, but for her unfortunate death before the period of division. Her death, as against the minor legatees, forfeited her share. She will be entitled to one-sixth of the residuum which may be left of -the estate, after satisfying to the surviving child of Mrs. Givens,'Wm'. Oswald, Sarah the wife of Slowman, Sarah the wife of Ricard, and Mary the wife of Freeman, each one-eleventh of the sales of the slaves, deducting their shares of the debt due to Beckham and wife. These persons being minors, qnd not bound by the division, are *350 entitled to shares, according to the number of persons who were alive at the time when the executors were legally liable to make a division. The consequence of this mode of division, will be to leave a surplus of the estate divisible into six equal parts, between and among Mrs. Dews and the five deceased children of Mrs. Givens. It is the consequence of holding the adults to be bound by the division made by their consent, and it gives to the minors the benefit of an advantageous contract. I rejoice to be enabled legally to produce this result,-for it enables us to visit, with just punishment, the avarice of adults who would seek advantage from such an awful dispensation of Divine Providence to parents, as the bereavement of five children in a few months. The payment to or purchase by Mr. Dews, if it does not exceed his wife’s share of this residuum, was legal and proper, and must be allowed to the executors. If it exceeds it, the excess must be paid by them to the estate. The same remarks apply to the payment to Mr. Ricard on account of his wife’s share, and the same rule will govern it.
3. Generally, executors or administrators are liable for interest on balances in their hands. It is their duty to make interest upon the funds when they can do so. But if a fund in the hands of an executor be claimed by two or more persons, and he holds it in his hands without using it, or making interest upon.it, until they have legally settled their rights, he is a mere stakeholder and not liable to interest. Bulows & Pope vs. O'Neall, 4 Des. 374. So if a debt is claimed against an estate, the justice of which is doubted, and the executor litigates the question in good faith, but retains a sufficient sum in his hands for its payment, which he does not use and from which he does not make interest, he will not be chargeable With interest on it. Pace vs. Burton, 1 Mc. Ch. 247. If, however, it should be that the sum which he alleges he retained, was his own debt for property bought at the sale, he would, in that case, be liable for interest. For he has the use of the property purchased, and its use is equivalent to the interest to be paid on the purchase •mo *351 ney. As the facts on this part of the case are not well ascertained, the Commissioner must ascertain them, and allow or disallow the interest according to the rule which I have stated.
4. A former recovery, between the same parties and- in the same right, concludes all questions -'which ought then to have been made. We have-no right to look into the decree of the Court of Equity to ascertain the items of the account. If the liability to account existed before the filing of the bill, the decree concludes the parties from setting it up. In this case, Mrs. Reynolds’ liability to account for the matters for which she is now required to answer, did not exist at the time of the filing of the formér bill. Her liability to account to the other executors, will depend upon the fact whether, in the eventual decree in the-first of these cases, they should be charged with any act of mal-administration in which her testator concurred. If they should, then their right to a contribution from her will arise. They could not have demanded any such account in their former bill, for until they were required to apcount for it, they had no cause of complaint against her testator. It is even now questionable whether the claim to contribution is not prematurely made. It would, perhaps, have been more regular to have postponed this bill until the. final decree, was rendered : but as the object of the parties is to have this litigation terminated, and as the question was not made, her plea was properly overruled by the Chancellor, and she must account for her testator’s equal share of any act of mal-administration which may be established against the surviving executors, and in which he concurred.
Another objection raised in the argument to the liability of Mrs. Reynolds, is, that she is not a party to the original bill, and that she cannot be, therefore, made a party to the cross-bill. “A cross-bill is,” (as Mr. Mitford, in his treatise on Equity Pleadings, 64, says,) “ a bill brought by a defendant against a plaintiff or other parties in a former bill touching the matter in question in the bill.”
It is, therefore, clear that none but a party to the original bill *352 can be made a party to a cross-bill. If the objection had been raised by way of demurrer, I should have been disposed to think it must have succeeded. But it cannot arise under a plea of a former recovery.
It is ordered and decreed, that the decree of Chancellor De-Saussure be modified according to the principles contained in this opinion, and that the cause be remanded to the Circuit Court, with instructions to the Commissioner to make up the accounts between the parties according to the rules herein-before laid down.
JohNsoN, J., concurred.

Decree modified.